Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>CHRISTOPHER J. NARVÁEZ RIVERA<br><br>Apelante | KLAN202400502 | APELACIÓN Procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Criminal Núm.:<br>D ST2023G0008<br>D PD2023G0013<br><br>Por: Art.18.2 Ley 8, Art. 217 CP |
| --- | --- | --- |

Panel integrado por su presidenta, la Juez Brignoni Mártir, el Juez Candelaria Rosa, la Jueza Álvarez Esnard y la Jueza Díaz Rivera.

Álvarez Esnard, jueza ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 25 de septiembre de 2025.

Comparece ante nos el señor Christopher J. Narváez Rivera ("señor Narváez Rivera" o "Apelante") mediante *Escrito de Apelación* presentado el 23 de mayo de 2024. En este, nos solicita que revoquemos la *Sentencia* emitida y notificada el 21 de mayo de 2024 por el Tribunal de Primera Instancia, Sala Superior de Bayamón ("foro primario" o "foro *a quo*"). Por virtud del aludido dictamen, el Apelante fue hallado culpable, de forma unánime por un jurado, por infracción al Artículo 217 del *Código Penal de Puerto Rico*, según enmendado, 33 LPRA sec. 528, ("Código Penal"), por posesión y traspaso de documentos falsificados y por una infracción al Artículo 18. 2 de la Ley Núm. 8 de 5 de agosto de 1987, *Ley para la Protección de la Propiedad Vehicular*, 9 LPRA sec. 3217 ("Ley Núm. 8"), sobre apropiación ilegal de un vehículo de motor. En consecuencia, el foro primario sentenció al señor Narváez Rivera a cumplir una condena de tres (3) años y nueve (9) meses de reclusión por la infracción al Artículo 217 del Código Penal y tres (3) años, nueve (9) meses y dos

(2) días por la infracción al Artículo 18.2 de la Ley Núm. 8. El foro primario determinó que las referidas condenas se cumplirían de manera consecutivas entre sí.

Por los fundamentos que discutiremos a continuación, **confirmamos** la *Sentencia* apelada.

## I.

El 2 de marzo de 2023, el Ministerio Público emitió cuatro (4) *Denuncias* contra el Apelante por infracciones a los Artículos 202, 215 y 217 del Código Penal, *supra*, y al Artículo 18 .2 de la Ley Núm. 8, *supra.* En esencia, las aludidas denuncias señalaban que el señor Narváez Rivera, allá para el 20 de enero de 2023, a propósito, y con conocimiento mediante fraude, treta o engaño, intentó adquirir la posesión de un vehículo de motor marca Toyota, modelo Corolla del año 2023, propiedad del concesionario Adriel Toyota de Dorado ("Adriel Toyota" o "concesionario"). En concreto, se le imputó al Apelante pasar como genuino un cheque por la cantidad de treinta y seis mil novecientos noventa y cinco dólares ($36,995.00) a nombre de la compañía Rivera Gas, a sabiendas de su falsedad, con el fin de apropiarse ilegalmente del aludido vehículo de motor. Ello, se materializó al Apelante entregar el referido cheque como genuino, con conocimiento de que era un documento falso ya que no estaba vinculado a ninguna cuenta bancaria.

Así las cosas, el 14 de marzo de 2023, el foro primario emitió *Orden de Arresto* contra el señor Narváez Rivera. Posteriormente, tras llevarse a cabo la vista preliminar el 23 de mayo de 2023, el foro *a quo* emitió *Resolución Vista Preliminar, Regla 23 de Procedimiento Criminal*. Mediante esta, encontró causa probable contra el Apelante por los delitos contenidos en el Artículo 217 del Código Penal, *supra,* y el Artículo 18.2 de la Ley Núm. 8, *supra.* Así pues, el 26 de mayo de 2023, el Ministerio Público emitió las correspondientes

acusaciones por la comisión de los delitos previamente mencionados, las cuales establecen lo siguiente:

El referido imputado CHRISTOPHER JOEL NARVÁEZ RIVERA, allí y entonces en fecha del 20 de enero de 2023 en el Dealer Adriel Toyota de Dorado Carr. 2 Km. 23.0 en Dorado, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de Bayamón, ilegal, a propósito, con conocimiento, con intención criminal y de defraudar, poseyó, y/o usó, y/o circuló, y/o pasó como genuino y/o verdadero cualquier documento, y/o instrumento y/o escrito falsificado, a sabiendas de que era falso, y/o alterado y/o falsificado y/imitado y/o que contenía información falsa; Consistente en que EL IMPUTADO FALSIFICÓ UN CHEQUE, USÓ, PASÓ, CAMBIÓ EL CHEQUE DE First Bank Isla Verde A NOMBRE RIVERA GAS como si fuese y pasó como genuino POR LA CANTIDAD $36,995.00 dólares, A SABIENDAS DE QUE DICHO CHEQUE ERA FALSIFICADO. La propiedad no fue recuperada.

El referido imputado CHRISTOPHER JOEL NARVAEZ RIVERA, allí y entonces en fecha del 20 de enero de 2023 en el Dealer Adriel Toyota de Dorado Carr. 2 Km. 23.0 en Dorado, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de Bayamón, a propósito, con conocimiento y con la intención criminal, empleó ardid, fraude, treta o engaño para adquirir la posesión, uso o control ilegal del vehículo mediante entrega voluntaria del dueño o custodia del vehículo objeto de la apropiación; Consistente en que el imputado se apropió ilegalmente del vehículo de Motor Marca Toyota, Modelo Corolla, color Gris, año 2023, Tablilla KBS-424 perteneciente al Dealer Adriel Toyota de Dorado, representado por el SR. NICOLAS NELSON AMARO RIVAS, luego de recibir del imputado un cheque #3454 del First Bank Isla Verde por la cantidad de $36,995.00 dólares para la compra del antes mencionado vehículo, dicho cheque no está vinculado a ninguna cuenta con el First Bank y el perjudicado le confió el referido vehículo. El valor de la propiedad es de $36,995.00 dólares.

Transcurrido varios eventos procesales, los días 1, 2, 3, 8, 9 y 10 de abril de 2024, se llevó a cabo el juicio por jurado. Durante el juicio, el Ministerio Público presentó los testimonios de los siguientes testigos:

1. Bryan Morales Orama

2. Nicolas Amaro Rivas

3. María del Carmen Rolón Rivera

4. Agente Ramón Rodríguez Colón

5. Augusto García Hernández

Por su parte la defensa presentó el testimonio del propio Apelante. Sometido el caso, las partes expusieron sus respectivos

informes finales frente al jurado. Acto seguido, el jurado se retiró a deliberar y el 10 de abril de 2024, informaron el veredicto mediante el cual encontraron al Apelante culpable de todos los delitos que pesaban en su contra. Como corolario de lo anterior, el 21 de mayo de 2024, el foro primario emitió *Sentencia* y por virtud de esta condenó a la Apelante a cumplir con las siguientes penas:

| NUM. DEL CASO | DELITO | PENA |
|---|---|---|
| D ST2023G0008 | INFR. AL ART. 217 C.P. | TRES (3) AÑOS DE PRISIÓN, MAS EL 25% DE REINCIDENCIA SIMPLE PARA UN TOTAL DE TRES (3) AÑOS Y NUEVE (9) MESES DE PRISIÓN |
| D PD2023G0013 | INFR. ART. 18.2 LEY 8 | TRES (3) AÑOS Y UN (1) DÍA DE PRISIÓN, MAS EL 25% DE REINCIDENCIA SIMPLE PARA UN TOTAL DE TRES (3) AÑOS Y NUEVE (9) MESES Y DOS (2) DÍAS DE PRISIÓN |
| -PENAS A CUMPLIRSE DE MANERA CONSECUTIVAS ENTRE SÍ Y CON CUALQUIER OTRA SENTENCIA QUE ESTUVIESE CUMPLIENDO.<br>-SE EXIME DEL PAGO DE LA PENA ESPECIAL DISPUESTA EN EL ART. 67 DEL CÓDIGO PENAL.<br>-DEBERÁ ABONARSE EL TÉRMINO QUE HA ESTADO EN PRISIÓN PREVENTIVA POR ESTOS CASOS, SI APLICA. | | |

Inconforme con el resultado, el 23 de mayo de 2024, el Apelante compareció ante esta Curia mediante el recurso de epígrafe y formuló el siguiente señalamiento de error:

Erró el honorable juzgador de los hechos al emitir un veredicto de culpabilidad en virtud de una prueba que no derrotó la presunción de inocencia del señor Christopher J. Narváez Rivera y mucho menos estableció su culpabilidad más allá de duda razonable

El 5 de junio de 2024, esta Curia emitió *Resolución* en la cual, entre otros asuntos, se le concedió al foro primario un término para que remitiera a la secretaría de este Tribunal de Apelaciones, la regrabación de los procedimientos, para así, ordenar la correspondiente transcripción. Asimismo, se dispuso que, una vez

la transcripción estuviera completada, la misma sería notificada tanto a la Oficina del Procurador General de Puerto Rico como al Apelante. Igualmente, se le concedió al Apelante un término de treinta (30) días contados a partir del momento en que esta *Curia* acogiera la transcripción de la prueba oral para presentar su alegato. Cónsono con lo anterior, dispusimos que la parte apelada en este caso, el Pueblo de Puerto Rico ("Apelado" o "el Estado") sometería su escrito en un término de treinta (30) días, a partir de la fecha de presentación del alegato instado por el Apelante.

Así las cosas, tras varios asuntos procesales, el 7 de marzo de 2025, acogimos la transcripción de la prueba oral. A su vez, el 28 de mayo de 2025, el señor Narváez Rivera presentó *Alegato del Apelante.* Por virtud de este escrito, resumió los testimonios vertidos en el juicio y expuso su teoría legal del caso. Por su parte, el 26 de junio de 2025, el Apelado sometió *Alegato de el* [sic] *Pueblo.* Mediante este, el Estado, de igual forma, resumió la prueba testifical presentada en el juicio, y argumentó que el error imputado por el Apelante no se cometió. Con el beneficio de la comparecencia de ambas partes, de los documentos que obran en el expediente, así como de los autos originales y de la transcripción de la prueba oral estipulada, procedemos a resolver el asunto que está ante nuestra consideración.

**II.**
**A. *Apelación Criminal***

En nuestra jurisdicción, "existe el derecho de todo acusado a apelar cualquier sentencia penal que recaiga en su contra". *Pueblo v. Rivera Ortiz*, 209 DPR 402, 419 (2022). Por ello, la determinación de culpabilidad del acusado más allá de duda razonable "es revisable en apelación, pues la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y derecho*". Pueblo v. Torres Medina*, 211 DPR 950, 959 (2023). Esto, pues, "[e]l análisis

de la prueba presentada requiere tanto de la experiencia del juzgador como de su conocimiento del Derecho, elementos éstos necesarios para darle a la controversia una solución justa". *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002).

Por otro lado, la presunción de inocencia es uno de los derechos fundamentales que le asiste a todo acusado de delito. Este derecho está consagrado en el Artículo II, Sección 11, de nuestra Constitución, 1 LPRA Art. II, Sec. 11, y establece que toda persona es inocente hasta que se pruebe lo contrario.

A su vez, el aludido imperativo constitucional se incorporó estatutariamente en la Regla 304 de Evidencia donde establece la presunción de que toda persona es inocente de delito o falta hasta que se demuestre lo contrario. 32 LPRA Ap. VI, R. 304. De igual modo, la Regla 110 de Procedimiento Criminal, dispone que "[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá". 34 LPRA Ap. II, R. 110.

Conforme con el principio del debido proceso de ley, una persona acusada de delito se presume inocente hasta que, en juicio público, justo e imparcial, el Ministerio Fiscal pruebe más allá de duda razonable cada elemento constitutivo del delito y la conexión de estos con el acusado. *Pueblo v. Resto Laureano*, 206 DPR 963, 967 (2021); *Pueblo v. Rosaly Soto*, 128 DPR 729, 739 (1991). La prueba del Ministerio Público tiene que ser satisfactoria, de manera que produzca la certeza o la convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Acevedo Estrada*, 150 DPR 84, 100 (2000). Si la prueba desfilada por el Estado produce insatisfacción en el ánimo del juzgador, estamos ante duda razonable y fundada. *Pueblo v. Cabán Torres*, 117 DPR 645, 652 (1986).

La duda razonable, según ha aclarado el Tribunal Supremo de Puerto Rico, "existe cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada". *Pueblo v. García Colon I*, 182 DPR 129, 175 (2011). Ello no significa que toda duda posible, especulativa o imaginaria tenga que ser destruida a los fines de establecer la culpabilidad del acusado con certeza matemática. *Pueblo v. Resto Laureano*, 206 DPR 963, 967 (2021) (Sentencia). Solo se exige que la prueba establezca aquella certeza moral que convence, dirige la inteligencia y satisface la razón. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 65 (1991). Ahora bien, en los casos donde la prueba no establezca la culpabilidad más allá de duda razonable, no puede prevalecer una sentencia condenatoria. Véase, *Pueblo v. Irizarry, supra*, pág. 789.

De otra parte, "los tribunales apelativos pueden considerar cualquier error de derecho cometido por el Tribunal de Primera Instancia". *Pueblo v. Rivera Ortiz, supra*, pág. 422. Ello incluye errores de derecho que comete el foro primario durante el procedimiento judicial. *Íd.* Esto es así, pues la función de aplicar correctamente el derecho es privativa del juez y es por esa facultad que el tribunal está en libertad de aplicar la norma que estime pertinente y adecuada. *Íd.*

Así pues, "el alcance de nuestra función revisora está limitado por consideraciones de extrema valía". *Pueblo v. Toro Martínez*, 200 DPR 834, 857 (2018). Cónsono con lo anterior, nuestro esquema probatorio se encuentra revestido por un manto de deferencia hacia la adjudicación de credibilidad que realizan los foros de instancias sobre los testigos que declaran ante sí, como a las determinaciones de hechos realizadas por el juzgador. *Pueblo v. Negrón Ramírez*, 213 DPR 895, 911 (2024).

Por otro lado, es norma reiterada que, de ordinario, no se favorece la intervención de tribunales apelativos para revisar la

apreciación de la prueba referente a la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022). A tenor con lo antes mencionado, el Tribunal Supremo de Puerto Rico ha definido el concepto pasión perjuicio y parcialidad como "aquellas inclinaciones personales de tal intensidad que llevan a un juzgador a actuar movido por éstas y a adoptar posiciones, preferencias o rechazos con respecto a las partes o sus causas, sin admitir cuestionamientos sobre las mismas y sin importar la prueba que se haya presentado en el juicio". *Pueblo v. Negrón Ramírez, supra,* pág. 912 citando a *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.,* 209 DPR 759, 779 (2022).

En cuanto al concepto *error manifiesto,* nuestra más Alta *Curia* ha determinado que el juzgador de los hechos incurre en dicho error si "aun habiendo alguna prueba que sostenga las determinaciones de hechos del tribunal, el foro revisor razona que se cometió un error, "como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida" (Énfasis suprimido). *Íd.,* págs. 912-913 citando a *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 772 (2013).

Ahora bien, un tribunal apelativo podrá revocar una determinación de culpabilidad realizada por el foro primario si "la prueba no concuerda con la realidad fáctica, es increíble o es imposible" (citas omitidas). *Íd.,* pág. 913. Asimismo, un foro apelativo también podrá intervenir con las determinaciones de hechos y apreciación de la prueba realizadas por el juzgador de los hechos "si se demuestra que éste incurrió en un abuso de discreción al apreciar y adjudicar la prueba presentada ante sí" (citas omitidas). *Íd.* A tono con lo anterior, nuestro Máximo Foro ha

destacado que la norma de deferencia apelativa aplica con el mismo rigor cuando lo que se tiene ante la consideración del foro apelativo es un veredicto de culpabilidad emitido por un jurado. *Íd.*, pág. 914.

### B. *Posesión de documentos falsificados*

El Artículo 217 del Código Penal de Puerto Rico, según enmendado, 33 LPRA 528, establece que "[t]oda persona que con el propósito de defraudar posea, use, circule, venda, o pase como genuino o verdadero cualquier documento, instrumento o escrito falsificado, a sabiendas de que es falso, alterado, falsificado, imitado o contiene información falsa, será sancionada con pena de reclusión por un término fijo de tres (3) años".

Como corolario de lo anterior, la profesora Dora Nevárez-Muñiz ha aclarado que el precitado delito es uno cuyo elemento mental versa en el propósito de defraudar. D. Nevares Muñiz, *Código Penal de Puerto Rico Comentado*, 4ta ed. rev., San Juan, Instituto para el Desarrollo del Derecho, 2019, pág. 341. Por consiguiente, el mero hecho de poseer un documento falsificado no configura este delito. *Íd.* Es necesario que se demuestre que **se posea el documento con el propósito de defraudar a otra persona y, de igual forma, es necesario conocer que el mismo es falsificado**. *Íd.* Basta con la ausencia de duda razonable sobre la falsedad del documento para establecer **el elemento de conocimiento** de la circunstancia de dicha falsedad. *Íd.* Así pues, "cuando se hace uso de un documento falso conociendo tal hecho se infiere que se intenta defraudar a otra persona". *Íd.* pág. 342.

### C. *Ley para la Protección de la Propiedad Vehicular*

La Ley Núm. 8 de 5 de agosto de 1987, Ley para la Protección de la Propiedad Vehicular, 9 LPRA sec. 3201 *et seq.* "se promulgó para establecer un registro e inventario de los vehículos de motor dentro de la jurisdicción de Puerto Rico y disponer mecanismos para la investigación de la procedencia y titularidad de los mismos".

*Rosario Rosado v. Pagan Santiago*, 196 DPR 180, 192 (2016) citando a la *Exposición de Motivos de la Ley Núm.* 8 de 1987 (1987 Leyes de Puerto Rico 654). El propósito de dicha legislación es prevenir el crimen asociado a la actividad ilícita de apropiaciones ilegales de vehículos de motor, especialmente los que estaban ligados a alguna obligación financiera. *Íd.*, pág. 193.

En ese sentido, el Artículo 18 de la referida legislación enumera ciertas instancias en las que se comete el delito de apropiación ilegal de un vehículo de motor. En lo pertinente, dicho artículo dispone los siguiente:

> Toda persona que ilegalmente se apropie sin violencia ni intimidación de algún vehículo de motor, perteneciente a otra persona, incurrirá en delito grave de tercer grado. El tribunal podrá imponer la pena de restitución en adición a la pena de reclusión establecida. Se entenderá que la apropiación es ilegal en cualquiera de las siguientes circunstancias, cuando la persona:
>
> [...]
>
> (2) Haya empleado ardid, fraude, treta o engaño para adquirir la posesión, uso o control ilegal del vehículo mediante entrega voluntaria del dueño, poseedor, conductor o custodia del vehículo objeto de la apropiación.
>
> [...]
>
> Para propósitos de este Artículo, el término "intermediario" significará cualquier persona natural o jurídica que, en carácter de intermediario, corredor, agente o facilitador, se dedique a la compra, venta, cesión o cualquier otro tipo de enajenación de vehículos de motor sin estar autorizado, en virtud de una licencia de concesionario o redistribuidor o que le autorice la venta de vehículos según se requiere por ley. Nada de lo dispuesto en este Artículo impedirá el procesamiento bajo cualquier otra disposición legal aplicable. Tampoco legaliza la práctica de intermediarios sin licencia de concesionario o cualquier licencia que autorice la venta de vehículos de motor, cuando se trata de vehículos de motor no financiados. 9 LPRA sec. 3217

**III.**

En el presente recurso, el Apelante nos solicita que revoquemos la *Sentencia* dictada el 21 de mayo de 2024 por el foro primario. Por virtud del aludido dictamen, el foro *a quo* sentenció al señor Narváez Rivera a cumplir consecutivamente una condena de tres (3) años y nueve (9) meses por violar el Artículo 217 del Código Penal, *supra,* y tres (3) años, nueve (9) meses y dos (2) días por

infringir el Artículo 18.2 de la Ley Núm. 8, *supra*. En específico, el Apelante alega en su señalamiento de error que, el foro primario incidió al emitir un veredicto de culpabilidad en virtud de una prueba que no derrotó la presunción de inocencia del acusado y que no estableció su culpabilidad más allá de duda razonable.

Por su parte, el Estado sostiene que el Ministerio Público probó más allá de duda razonable todos los elementos de los dos (2) delitos imputados al Apelante. Argumenta el Apelado que el señor Narváez Rivera entregó un cheque falso como forma de pago para adquirir un vehículo de motor, consciente de su falsedad y con la intención de defraudar al concesionario Adriel Toyota. Asimismo, alega que se demostró que el señor Narváez Rivera, con conocimiento de la falsedad del cheque, el cual no correspondía a una cuenta válida y tenía una fecha anterior, logró mediante engaño que el concesionario le entregara el vehículo. El Estado esboza que, de esta forma, el Apelante se apropió sin violencia ni intimidación del vehículo de motor propiedad de Adriel Toyota, al presentar un cheque con información falsa que posteriormente fue devuelto por el banco. Del mismo modo, el Estado argumenta que, ante el incumplimiento del pago acordado y la negativa de devolver el vehículo voluntariamente, se configuró además, el delito de apropiación ilegal conforme al Artículo 18.2 de la Ley Núm. 8, *supra*.

Ante este cuadro, procedemos a atender el señalamiento de error esgrimido por el señor Narváez Rivera, el cual versa sobre el veredicto de culpabilidad por los delitos en contra de éste, los cuales consisten en infracción al Artículo 217 del Código Penal, *supra*, y el Articulo 18.2 de la Ley Núm. 8, *supra*. En concreto, el señor Narváez Rivera argumenta que no se derrotó su presunción de inocencia y que su culpabilidad no fue probada más allá de duda razonable. Para atender este señalamiento de error de forma rigurosa y cumplir

cabalmente con nuestra función revisora, a continuación, expondremos de manera sucinta la prueba testifical que se presentó durante el juicio.

El **1 de abril de 2024**, el Ministerio Publico sentó a testificar a Bryan Morales Orama ("señor Morales Orama") quien afirmó ser vendedor de autos en el concesionario Adriel Toyota en Dorado.[1] Indicó que se desempeñaba como ejecutivo de ventas en dicho concesionario, cargo que ocupaba desde aproximadamente tres (3) años.[2] Explicó que sus funciones consistían en asesorar a los clientes y gestionar la venta de vehículos.[3] Detalló que los métodos de pago que aceptaba el concesionario a la hora de vender un vehículo eran efectivo, cheque de gerente o ATH.[4] Añadió que, en caso de surgir un inconveniente con un cheque, el personal de contabilidad se comunicaba con el vendedor correspondiente, quien a su vez, se encargaba de realizar las gestiones de cobro necesarias.[5] Especificó que cuando una compra se realiza mediante cheque, el *dealer* lo clasifica como una venta *cash*, ya que no involucra financiamiento.[6]

El señor Morales Orama declaró que, el **20 de enero de 2023**, le vendió un vehículo de motor al señor Narváez Rivera, **a quien identificó en sala**.[7] Aseveró que previamente, mediante llamadas telefónicas, el Apelante lo contactó pues, estaba interesado en obtener información de un automóvil y, a través de mensajes por *WhatsApp*, el señor Morales Orama le envió fotografías del vehículo en cuestión, un Toyota Corolla SE Híbrido, modelo 2023, color gris oscuro.[8] Indicó que estas comunicaciones se mantuvieron

---

[1] *Véase*, Transcripción de la Prueba Oral ("TPO"), pág. 5 líneas 1-13.
[2] *Íd.*, pág. 5, líneas 2-16.
[3] *Íd.*, pág. 5, líneas 19-20.
[4] *Íd.*, pág. 6, líneas 18-20.
[5] *Íd.*, pág. 6, líneas 21-27.
[6] *Íd.*, pág. 7, líneas 7-12.
[7] *Íd.*, pág. 8, líneas 20-29- pág. 9 líneas 1-13.
[8] *Íd.*, pág. 9, líneas 17-25- pág. 10 líneas 3-10.

aproximadamente por un (1) mes.[9] Detalló además, que mediante mensajes, informó al señor Narváez Rivera que las ventas en el concesionario se realizaban en efectivo o mediante cheque a nombre del gerente.[10] No obstante lo anterior, mencionó que consultaría con el dueño del concesionario, el señor Nicolás Amaro ("señor Amaro"), para que autorizara la venta con un cheque personal en vez de un cheque de gerente.[11]

Durante su testimonio, el señor Morales Orama relató que le comunicó al Apelante que el señor Amaro autorizó la entrega del vehículo mediante cheque personal.[12] Señaló que se procedió entonces a solicitar la información personal necesaria para dar de baja el vehículo y realizar la orden de compra, requiriéndose copia de la licencia de conducir, nombre completo, dirección física y postal, datos que fueron proporcionados íntegramente por el Apelante.[13] Adujo que le entregó el vehículo al Apelante aproximadamente a la 1:00 pm en las inmediaciones de una funeraria y narró que el Apelante le "entreg[ó] un cheque, era el cheque de... obviamente de la cantidad de lo que costaba el vehículo".[14] Sobre esto último, el señor Morales Orama detalló que recibió del Apelante "el cheque obviamente que me entreg[ó] eh a nombre de Rivera Gas por la cantidad de 36,9,95 de *First Bank*, Isla Verde" (en adelante, *cheque entregado*). [15]

Precisó que en ese momento verificó y corroboró que la persona que recibió el vehículo era efectivamente el señor Narváez Rivera, el mismo individuo con quien había mantenido todas las comunicaciones previas.[16]

---

[9] *Íd.*, pág. 10, líneas 19-29.
[10] *Íd.*, pág. 13, líneas 22-29.
[11] *Íd.*, pág. 13, líneas 22-29; pág. 14 líneas 12 -30- pág. 15 líneas 1-4.
[12] *Íd.*, pág. 18, líneas 9-17.
[13] *Íd.*, pág.19, líneas 7-9.
[14] *Íd.*, pág. 20, línea 18-20.
[15] *Íd.*, pág. 20, líneas 26-27. Para propósito de claridad, nos estaremos refiriendo al cheque entregado por el Apelante como "*cheque entregado*".
[16] *Íd.*, pág. 21, líneas 1-11.

El señor Morales Orama manifestó que posteriormente, el 23 de enero de 2023, el Apelante, mediante mensaje le comunicó: **"buen día, mira el cheque que lo depositen mañana por favor, ya mand[é] a mover el dinero".**[17] Explicó que el Apelante previamente **había acordado con el dueño del concesionario que el *cheque entregado* tendría una fecha diferente,** ya que se le concedió una prórroga al señor Narváez Rivera para transferir los fondos necesarios para completar la transacción.[18] El testigo clarificó que el día de la entrega del vehículo, entiéndase, el 20 de enero de 2023, el *cheque entregado* fue suministrado a la cajera para su procesamiento.[19]

El testigo continuó su relato expresando que, **el 1 de febrero de 2023**, se comunicó con el señor Narváez Rivera para indagar sobre el estado del *cheque entregado*, **luego de que el área de contabilidad del concesionario le informara que este no estaba respaldado por fondos en ninguna cuenta bancaria y que no era posible cobrarlo**.[20] Declaró que el Apelante respondió mediante la aplicación móvil *WhatsApp*, "voy a tener que llevarte el cheque yo a las 11 AM".[21] El señor Morales Orama relató que le preguntó al Apelante si se encontraba de viaje, pues previamente el señor Narváez Rivera había comunicado que estaría fuera de Puerto Rico para atender un asunto personal.[22] Sin embargo, afirmó que el Apelante le indicó que regresaría ese mismo día. En respuesta, el señor Morales Orama expresó lo siguiente: "llévalo mañana sin falta pero hazlo de gerente porque ya las instrucciones habían sido no hay *break*, que lo traiga como se supone que sea o verdad, o que traiga entonces el dinero en efectivo".[23]

---

[17] *Íd.*, pág. 21, líneas 17-18.
[18] *Íd.*, pág. 21, líneas 19-23.
[19] *Íd.*, pág. 22, líneas 3-8.
[20] *Íd.*, pág. 22, líneas 13-17.
[21] *Íd.*, pág. 22, líneas 28-30.
[22] *Íd.*, pág. 23, líneas 1-6.
[23] *Íd.*, pág. 23, línea 15.

El **2 de febrero de 2023**, el señor Morales Orama expresó que le escribió al Apelante "acuérdate del cheque hoy por favor, me escribieron ahora otra vez".[24] Agregó que, en respuesta, el Apelante envió una imagen de la identificación de Alejandro Morales, un amigo suyo quien según el Apelante, contaba con buen historial crediticio, a quien propuso como alternativa hasta que él llegara al concesionario.[25] Esbozó que la razón de ello era que el Apelante quería hacer un *supporting.*[26] Esto es un procedimiento especial que realizan los *dealers* cuando un cliente efectúa una compra en efectivo, pero al momento de la transacción no tiene la totalidad del dinero. A esos fines se procede entonces a realizar una precalificación al cliente y se somete esa información al banco.[27]

El señor Morales Orama indicó que el señor Narváez Rivera, luego aclaró que no podría regresar a Puerto Rico ese día, a saber, **el 2 de febrero de 2023**.[28] Expuso que las comunicaciones continuaron, y el testigo afirmó que le reiteró al Apelante la urgencia de resolver el asunto, ya que su empleo estaba en riesgo.[29] Además, añadió que dejó claro que la opción de un *supporting* no era viable, y que en cualquier caso, lo acordado era un cheque de gerente.[30] Narró que al procesar el crédito del señor Alejandro Morales, se le solicitó al Apelante el número de teléfono de Alejandro Morales, el cual no fue proporcionado.[31] Señaló que a pesar de ello, se procedió con la evaluación, y consecuentemente se determinó que Alejandro Morales no cumplía con los requisitos necesarios para su aprobación.[32] Detalló que le informó al señor Narváez Rivera que el **concesionario solicitó recoger el vehículo,** a lo que el Apelante

---

[24] *Íd.*, pág. 24, líneas 19-22.
[25] *Íd.*, pág. 24, líneas 20-28- pág. 25 líneas 1-18.
[26] *Íd.*, pág. 25, líneas 16-17.
[27] *Íd.*, pág. 25, líneas 13-25.
[28] *Íd.*, pág. 26, líneas 17-20.
[29] *Íd.*, pág. 26, líneas 19-21- pág. 27, líneas 3-9.
[30] *Íd.*, pág. 27, líneas 24-28.
[31] *Íd.*, pág. 28, líneas 16-20.
[32] *Íd.*, pág. 29, línea 11.

afirmó que no podría regresar a Puerto Rico hasta **el próximo día temprano**.[33] Atestó que a ello le respondió que el asunto debía resolverse de inmediato, ya que "Adriel" exigía la devolución del vehículo.[34] Sin embargo, expresó que el Apelante le comunicó que "el carro está en casa, pero no hay nadie; estamos de viaje", y prometió contactar al señor Amaro.[35]

El testigo declaró además que, **el 4 de febrero de 2023**, al reclamarle nuevamente el pago al señor Narváez Rivera, éste solicitó una oportunidad para resolver la situación.[36] Apoyado en esta premisa, escribió por mensaje de *WhatsApp* lo siguiente: "[n]o estoy jugando, ni me he escondido, ni lo haré ahora. Si me llamas, siempre te contesto; te voy a resolver, ya te lo dije".[37] A esto, el testigo Morales Orama manifestó que le respondió lo siguiente "**no se trata de resolver cuando tú puedas, es hoy: el carro o el dinero**" (Énfasis nuestro).[38] En respuesta a este mensaje, explicó que a las 10:28 am, el Apelante contestó "**yo me voy a quedar con el carro y te lo voy a pagar**"(Énfasis nuestro).  Con lo anterior expresado añadió "voy a llamar a Adriel y a todos, porque una cosa es el pasado y otra es ahora".[39] El testigo sostuvo que ante la falta de una solución concreta, le advirtió que buscaría el vehículo el lunes.[40] Expuso que, ante la negativa del Apelante, le apercibió sobre las tres (3) opciones que tenía disponibles: "**el lunes a las 9 AM dinero en el dealer, carro o querella por fraude**" (Énfasis nuestro).[41] Señaló el testigo que a esos efectos, el Apelante se comunicó con el dueño del concesionario y le indicó que "**el lunes saldría directamente para el dealer a la 1 en punto con el cheque de gerente**" (Énfasis

---

[33] *Íd.*, pág. 29, líneas 12-19.
[34] *Íd.*, pág. 29, líneas 14-16.
[35] *Íd.*, pág. 29, líneas 22-23.
[36] *Íd.*, pág. 30, líneas 13-14.
[37] *Íd.*, pág. 30, líneas 17-19.
[38] *Íd.*, pág. 30, líneas 20-21.
[39] *Íd.*, pág. 30 líneas 23-25.
[40] *Íd.*, pág. 30 líneas 19-21.
[41] *Íd.*, pág. 30 líneas 5-7.

nuestro).[42] Agregó que en ningún momento el señor Amaro se comunicó para que detuviera las gestiones de cobro o la recuperación del vehículo.[43]

Así las cosas, el señor Morales Orama aseveró que el domingo **5 de febrero de 2023** le comunicó al Apelante lo siguiente: "buenos días, dame una llamada porque si quieres [sic] busques los… unos signos de dinero, o sea el dinero, hoy mismo pero *cash*, llámame".[44] A ello, el Apelante respondió "yo no voy a buscar todo ese dinero *cash* y menos por ahí".[45] El señor Morarles Orama mencionó que, en la siguiente comunicación que tuvo con el Apelante, **el 6 de febrero de 2023**, le indicó a éste último que necesitaba resolver el asunto porque ya lo habían reunido.[46] Relató que el Apelante le escribió: "buen día, ya yo cuadr[é] y le pedí permiso a Nico [señor Amaro], voy a resolver ahora. Ayer te llamé pa' l de veces, salgo de algo que tengo y voy te hago el de gerente".[47] No obstante, sostuvo que el señor Amaro no mantuvo comunicación alguna con el testigo sobre esta decisión.[48] Expresó que, ese mismo día, le cuestionó al Apelante por qué no se presentó al mediodía, advirtiéndole lo siguiente:  "Christopher mano necesito resolver me estas dando larga y ganándome tiempo, todos los días me dices algo diferente, eh…si el cheque no está aquí hoy voy a llamar a Toyota de Puerto Rico para que me den la ubicación de, de, del auto".[49] Agregó que el Apelante le respondió con el siguiente mensaje: "ya lo cuadré con Nico[las Amaro], se le pidió un *break* y me dijo que está bien, no te van a molestar más".[50] Explicó que, en la siguiente comunicación efectuada **el 8 de febrero de 2023**, le envió un mensaje al Apelante

---

[42] *Íd.*, pág. 31, líneas 9-10.
[43] *Íd.*, pág. 26, líneas 29-30- pág. 27, línea 1.
[44] *Íd.*, pág. 31, líneas 18-21.
[45] *Íd.*, pág. 31, líneas 21-22.
[46] *Íd.*, pág. 32, líneas 20-22.
[47] *Íd.*, pág. 32, línea 22-29.
[48] *Íd.*, pág. 32, líneas 24-29.
[49] *Íd.*, pág. 33, líneas 11-14.
[50] *Íd.*, pág. 33, líneas 17-18.

por no haberse resuelto el asunto. En respuesta éste le reiteró que ya había hablado con el señor Amaro y, además, aseguró que no lo molestaría más, que llevaría el cheque de gerente a contabilidad.[51]

Relató el testigo Morales Orama que, **el 10 de febrero de 2023**, intentó llamar al señor Narváez Rivera, pero este no contestó.[52] Posteriormente, alegó que, **el 15 de febrero de 2023**, al comunicarse nuevamente con el Apelante, las gestiones realizadas resultaron infructuosas.[53] Mencionó que ese mismo día le exigió resolver el pago del vehículo y le notificó que se estaría presentando una querella en su contra.[54] Declaró también que, el **20 de febrero de 2023**, terminó las comunicaciones con el Apelante y el agente Rodríguez Colón lo citó al cuartel por motivo de la querella.[55] Explicó que, tras detallar la transacción, la información del vehículo y del Apelante, el agente Rodríguez Colón procedió a buscar y recuperar el auto.[56]

En el contrainterrogatorio, el señor Morales Orama declaró que el **20 de enero de 2023**, se comunicó por vía telefónica con el Apelante y este le manifestó su interés en la compra de un vehículo mediante cheque personal, a lo que el testigo respondió que ese tipo de transacción requería autorización del señor Amaro.[57] Mencionó que el Apelante alegó conocer al señor Amaro y haberle comprado previamente vehículos con cheques personales.[58] Alegó que el señor Amaro luego lo llamó para confirmar que el Apelante era cliente suyo, que le había comprado varios vehículos de esa manera, y "que entregara el vehículo y que aceptara, que recogiera el cheque".[59] Indicó que, aunque la venta ocurrió "el día

---

[51] *Íd.*, pág. 34, líneas 1-8.
[52] *Íd.*, pág. 34, líneas 17-24.
[53] *Íd.*, pág. 35, líneas 1-3.
[54] *Íd.*, pág. 35, líneas 8-11.
[55] *Íd.*, pág. 35, líneas 24-25.
[56] *Íd.*, pág. 35, líneas 20-30- pág. 36, líneas 12-13.
[57] *Íd.*, pág. 38, líneas 27-30-pág. 39, líneas 15-18.
[58] *Íd.*, pág. 39, líneas 14-16.
[59] *Íd.*, pág. 40, líneas 18-22.

20 [de enero]", el *cheque entregado* "iba a tener fecha del 23", dato conocido tanto por él como por el señor Amaro.[60] El señor Morales Orama expresó que al recibir el *cheque entregado*, el mismo tenía fecha del **"23 de enero"** para que fuese depositado en dicha fecha, ya que de hacerlo el "20 de enero", el cheque no tendría fondos conforme se lo explicó el Apelante.[61]

Por otro lado, el señor Morales Orama atestiguó que el señor Amaro y él aceptaron el *cheque entregado* a sabiendas de su fecha futura.[62] Relató que, al momento que le notificaron al Apelante que el *cheque entregado* había rebotado, se suponía que éste hubiese resuelto la situación con una transferencia.[63] Detalló en el contrainterrogatorio que, el 1 de febrero de 2023, se comunicó con el señor Narváez Rivera para gestionar el cobro, y éste alegó estar de viaje aunque no se negó a resolver la situación.[64] Explicó nuevamente que el Apelante sugirió un *supporting* con un amigo, quien no cualificó, y que, pese a no ser el procedimiento habitual, se accedió a evaluarlo por la urgencia.[65] Declaró que el Apelante luego propuso que fueran a buscar el dinero a lo que el testigo se negó pues en ese momento, de esa manera no se podía.[66]

En el redirecto, el testigo afirmó que nunca le señaló al Apelante que la fecha que constaba en el *cheque entregado* era el **"enero 23 del 2022", un año antes**, pues, al estar autorizado por el señor Amaro, omitió mencionarlo.[67] No obstante lo anterior, aclaró el testigo que el señor Narváez Rivera solicitó un término de tres (3) días para que el *cheque entregado* tuviera

---

[60] *Íd.*, pág. 44, líneas 14-28.
[61] *Íd.*, pág. 44, líneas 24-30.
[62] *Íd.*, pág. 45, líneas 1-3.
[63] *Íd.*, pág. 45, líneas 28-29- pág. 46 líneas 1-2.
[64] *Íd.*, pág. 46, líneas 14-22.
[65] *Íd.*, pág. 47, líneas 18- 25.
[66] *Íd.*, pág. 49, líneas 14-27.
[67] *Íd.*, pág. 52, líneas 17- 24.

fondos.[68] Finalmente, declaró que el Apelante **en ningún momento devolvió voluntariamente el vehículo al *dealer*.**[69]

Culminada la declaración del señor Morales Orama, el **2 de abril de 2024,** se sentó a declarar el señor Amaro. Este testigo expuso que residía en el municipio de Bayamón, mencionó que se dedicaba a la venta y reparación de autos desde el año 1986, y esbozó que  actualmente fungía como presidente de Adriel Toyota.[70] Testificó que el 20 de enero de 2023 recibió una llamada del gerente, quien le informó que la compañía Rivera Gas,  entidad con la que habían realizado transacciones anteriores, estaba interesada en adquirir un nuevo vehículo.[71] Relató que el gerente le transfirió la llamada con el señor Morales Orama, quien a su vez, lo transfirió con el Apelante.[72] El señor Amaro esbozó que el Apelante le comunicó que ya lo conocía y expresó su intención de comprar el vehículo mediante "un cheque de la [...] compañía Rivera Gas".[73] Sostuvo que recordaba haber hecho negocios con Rivera Gas en ocasiones previas.[74] Aunque no podía precisar las fechas exactas, estimó fue aproximadamente diecisiete (17) años atrás, a lo que  añadió que dichas transacciones incluyeron la compra de servicios de gas para otro negocio que él poseía.[75] Explicó que, "como él [el Apelante] me dijo que era de Rivera Gas yo le di, le autoric[é] al vendedor, que recibiera el cheque".[76] Además, mencionó que tampoco vio a la persona que portaba el cheque, ya que toda la gestión se manejó vía telefónica.[77]

---

[68] *Íd.*, pág. 51, líneas 9-12.
[69] *Íd.*, pág. 51, líneas 24-29.
[70] *Íd.*, pág. 55, líneas 17-21.
[71] *Íd.*, pág. 55, líneas 12-20.
[72] *Íd.*, pág. 55, líneas 22-24.
[73] *Íd.*, pág. 55, líneas 22-26.
[74] *Íd.*, pág. 55, líneas 27-28.
[75] *Íd.*, pág. 56, líneas 4-8.
[76] *Íd.*, pág. 56, líneas 11-19.
[77] *Íd.*, pág. 56, líneas 20-25.

Asimismo, adujo que no había visto o hablado previamente con el Apelante, **pues solo conocía a la compañía Rivera Gas**.[78] Testificó que "el cheque [...] se aceptó, se depositó y luego al cabo de los días [...] vino el cheque de vuelta [...]".[79] Precisó que fue notificado de que el cheque rebotó porque él mismo lo había autorizado, por tanto procedió a contactar a Rivera Gas.[80] Narró que conversó con el Apelante, quien se disculpó por el inconveniente, **alegó que hubo un error con la cuenta y prometió entregar otro cheque**.[81] Sin embargo, afirmó que el nuevo cheque **nunca llegó**, pese a múltiples llamadas en las que el Apelante aseguró que acudiría.[82] Declaró que llamó directamente a Rivera Gas, ya que el Apelante se identificó como encargado, pero no empece a ello, resultaron infructuosas las gestiones.[83]

Indicó que, a pesar de que el Apelante se comprometió a presentarse al concesionario, **dejó de responder las llamadas y nunca cumplió.**[84] Por tanto, relató que, al ver que el *cheque entregado* indicaba "cuenta cerrada", procedió a radicar una querella en el cuartel de policía de Dorado.[85] Agregó que la División de Vehículos Hurtados inició la búsqueda del automóvil y destacó que el agente Ramón Rodríguez Colón fue quien atendió el caso y logró recuperar el vehículo.[86] Durante el contrainterrogatorio, el señor Amaro manifestó que vio el *cheque entregado* cuando fue devuelto por estar la cuenta cerrada.[87] Asimismo, cuando se le preguntó si el señor Morales Orama le advirtió que el *cheque*

---

[78] *Íd.*, pág. 57, líneas 1-7.
[79] *Íd.*, pág. 57, líneas 9-12.
[80] *Íd.*, pág. 57, línea 14-16.
[81] *Íd.*, pág. 57, líneas 13-20.
[82] *Íd.*, pág. 57, líneas 21-27.
[83] *Íd.*, pág. 58, líneas 1-19.
[84] *Íd.*, pág. 58, líneas 20-21.
[85] *Íd.*, pág. 59, líneas 4-9.
[86] *Íd.*, pág. 59, líneas 28-30- pág. 60, líneas 1-5.
[87] *Íd.*, pág. 61, líneas 23-26.

*entregado* tenía fecha en la cual constaba el año 2022, respondió que no.[88] Con esto culminó su testimonio.

Según se desprende del expediente y de la transcripción de la vista, el **2 de abril de 2024,** se sentó a testificar la señora María Colón ("señora Colón"), quien declaró que residía en el municipio de Corozal y trabaja en el departamento de contabilidad del concesionario Adriel Toyota desde hace doce (12) años.[89] Detalló que, como parte de sus funciones en el área de contabilidad, recibía cheques, trabajaba con cheques devueltos y realizaba depósitos.[90] Manifestó que el **27 de enero de 2023** "recibimos un cheque de… devuelto".[91] Sobre esto último, abundó lo siguiente: "una compañera mía que trabaja en los estados bancarios que, trabaja la reconciliación me hace llegar una copia del cheque y me notifica pues, que tiene un cheque devuelto para que yo lo trabaje".[92] Identificó en sala la copia de la reconciliación bancaria del cheque devuelto por la cantidad de $36,995.00, así como el recibo de pago emitido al momento de la venta.[93] Señaló que dicho recibo correspondía a la compra de un vehículo Toyota Corolla 2023, realizada el 20 de enero de 2023 por el vendedor Bryan Morales Orama.[94] Posteriormente, reconoció la copia del *cheque entregado* recibido por el concesionario ubicado en el municipio de Dorado, referente a la venta realizada al Apelante por $36,995.00, con número de cheque 3454 correspondiente a *First Bank.*[95] Expresó que, una vez reunidos los documentos pertinentes, se comunicó con el vendedor a cargo para informarle que el cheque de la venta había sido devuelto, a fin de que este gestionara el cobro

---

[88] *Íd.*, pág. 67, líneas 18-20.
[89] *Íd.*, pág. 74, líneas 19- 27.
[90] *Íd.*, pág. 75, líneas 1-4.
[91] *Íd.*, pág. 76, líneas 22-24.
[92] *Íd.*, pág. 76, líneas 25-29.
[93] *Íd.*, pág. 77, líneas 9-17, pág. 78, líneas 1-17.
[94] *Íd.*, pág. 78, líneas 1-17.
[95] *Íd.*, pág. 78, líneas 18-30.

con el cliente.[96] Mencionó que desconocía la razón de la devolución, ya que no pudo identificar las iniciales anotadas en la reconciliación bancaria, pues nunca antes las había visto.[97]

Surge de la transcripción que la señora Colón **identificó en sala la copia exacta del *cheque entregado*, el cual fue devuelto por el banco *First Bank***, e indicó que surgía del documento que la razón para su devolución fue **la imposibilidad de localizar la cuenta asociada**.[98] Afirmó que, en consecuencia, el *cheque entregado* no pudo ser redepositado debido a que "no pudieron localizar cuenta, o sea que no me sirve el cheque".[99] Igualmente, identificó en sala la carta enviada por el banco *First Bank* en la que la entidad notificó **la devolución del cheque por "no localizar la cuenta"**, junto con la hoja de depósito presentada por el concesionario y el recibo bancario que acreditaba que el depósito se efectuó el 24 de enero de 2023, pero fue rechazado.[100] Sostuvo que **no recibió ningún otro cheque para el pago de la referida venta**.[101]

Durante el contrainterrogatorio, declaró que, aunque ella era la encargada de depositar los cheques en la compañía, en este caso no lo hizo, ya que el cheque llegó directamente a la persona encargada de la reconciliación bancaria.[102] Aseveró que tuvo acceso al *cheque entregado* por primera vez el 26 de enero de 2023, cuando fue devuelto por el banco.[103] Indicó que desconocía si al momento del depósito se verificó la fecha del cheque, puesto que no fue ella quien lo procesó.[104] Relató que, al revisar el cheque devuelto, observó que este tenía fecha del año 2022, **por lo que ya estaba**

---

[96] *Íd.*, pág. 79, líneas 11-18.
[97] *Íd.*, pág. 79, líneas 26-28- pág. 80, líneas 1-2.
[98] *Íd.*, pág. 80, líneas 3-12; 24-26.
[99] *Íd.*, pág. 81, líneas 10-12.
[100] *Íd.*, pág. 81, líneas 21-29- pág. 82, líneas 1-7.
[101] *Íd.*, pág. 82, líneas 23-26.
[102] *Íd.*, pág. 83, líneas 1-15.
[103] *Íd.*, pág. 83, líneas 18-25.
[104] *Íd.*, pág. 84, líneas 15-18.

**vencido al momento de su entrega**.[105] Explicó que, al estar caducado, **el procedimiento correcto era que el cliente presentara un nuevo cheque, ya que el primero no podía ser redepositado**.[106] Por último, reiteró que no recibió otro cheque con fecha válida para su reposición.[107]

Luego del testimonio de la señora Colón, **el 3 de abril de 2024**, declaró el agente Ramón Rodríguez Colón ("agente Rodríguez Colón") quien funge como Agente en la División de Vehículos Hurtados de la Policía en Bayamón y según su testimonio lo ha hecho por veintiocho (28) años.[108] Mencionó que, como parte de sus funciones, investiga hurtos de vehículos, timos, casos de treta, engaño y fraude relacionados con este tipo de delitos.[109] En lo pertinente, explicó que la modalidad de fraude ocurre principalmente cuando personas adquieren un vehículo mediante documentación o información fraudulenta proporcionada al vendedor.[110] Añadió que, en casos de cheques, si el cheque no puede ser validado, se solicita un *subpoena* a la institución bancaria donde fue emitido para obtener una certificación que confirme si pertenece o no a una cuenta válida.[111]

En lo que respecta al presente caso, adujo que estuvo a cargo de la investigación relacionada con el señor Narváez Rivera, **a quien identificó en sala.**[112] Relató que inició la investigación luego de que, el 20 de febrero de 2023, el señor Morales Orama, querellante y vendedor de Adriel Toyota, acudiera a la División de Vehículos Hurtados. Indicó que, durante la entrevista realizada al señor Morales Orama, este le informó que vendió en efectivo, en otras

---

[105] *Íd.*, pág. 84, líneas 19-30.
[106] *Íd.*, pág. 86, líneas 2-5.
[107] *Íd.*, pág. 86, líneas 26-30.
[108] *Íd.*, pág. 90, líneas 17-23.
[109] *Íd.*, pág. 91, líneas 1-3.
[110] *Íd.*, pág. 91, líneas 4-9.
[111] *Íd.*, pág. 92, líneas 3-11.
[112] *Íd.*, pág. 98, líneas 12-26.

palabras, sin financiamiento, un vehículo Toyota Corolla Híbrido del 2023 a un cliente llamado Christopher Narváez, pero surgió un problema con el pago, ya que "el cheque no se pudo validar ni cambiar cuando se pasó a la parte [...] de nómina del *dealer* para as[í] poder reclamar el dinero [...] para la venta".[113]

Declaró que entrevistó al señor Amaro, dueño de Adriel Toyota, así como a un representante de *First Bank*, a un representante de la compañía de gas y a la señora Colón, representante del área de contabilidad de Adriel Toyota.[114] Señaló que el señor Morales Orama le entregó la hoja de venta y una copia del *cheque entregado* por el Apelante utilizado en la transacción, con el cual solicitó a *First Bank* que certificara su autenticidad.[115] Afirmó que, al consultar con el departamento de requerimiento legal de *First Bank*, le informaron lo siguiente: **"era un cheque que se desconoce, eh... cantidad, que no pertenece a *First Bank* ni el número de ruta, ni número de cheque que lo puedan localizar como ... como cuenta de *First Bank*"**(Énfasis nuestro).[116] Sobre esto, destacó que *First Bank* le proporcionó una certificación mediante *subpoena*, la cual identificó en sala.[117]

Además, expresó que el señor Morales Orama le indicó que la comunicación con el Apelante se realizó mediante mensajes de texto, los cuales le fueron entregados por correo electrónico a solicitud suya.[118] Reconoció en sala la conversación obtenida del teléfono del señor Morales Orama, la cual incluía desde las gestiones iniciales de venta hasta los últimos mensajes relacionados con el cobro y la recuperación del vehículo.[119] Aseguró que pudo revisar los mensajes originales, ya que el señor Morales Orama se los mostró desde su

---

[113] *Íd.*, pág. 93, líneas 5-19.
[114] *Íd.*, pág. 93, líneas 22-19.
[115] *Íd.*, pág. 94, líneas 1-11.
[116] *Íd.*, pág. 94, líneas 15-18; 21-25.
[117] *Íd.*, pág. 94 líneas 28-30- pág. 95, líneas 1-8.
[118] *Íd.*, pág. 95, líneas 14-23.
[119] *Íd.*, pág. 95, líneas 29-30- pág. 96 líneas 1-4.

teléfono.[120] Detalló que surgían de los mismos "**las súplicas y gestiones que el vendedor Bryan Morales realizó mediante textos y, y, y, ... voicemail dentro del chat relacionados a la paga del vehículo o la entrega del vehículo, para no tener problemas en su trabajo**" (Énfasis nuestro).[121]

El agente Rodríguez Colón continuó su relato explicando que, con la hoja de venta, la dirección del Apelante y una copia de su licencia, logró identificar tanto al individuo que recibió el vehículo como al automóvil en cuestión.[122] Expresó que, tras recibir una llamada informándole sobre la posible ubicación del vehículo, se trasladó al lugar **el 20 de febrero de 2023**, misma fecha que se había radicado la querella.[123] Describió que encontró el vehículo, cuya descripción, tablilla y número de serie coincidían con los registros, confirmando que se trataba del mismo.[124]

Relató que, acto seguido, se dirigió a la residencia donde estaba estacionado el vehículo. Llamó a "Christopher", el Apelante, le solicitó identificación y le explicó el motivo de su presencia.[125] Sostuvo que éste se identificó como "Christopher Narváez".[126] Posteriormente, el agente procedió a informarle que el vehículo debía ser ocupado y trasladado al cuartel por una posible apropiación mediante treta, engaño o fraude.[127] Manifestó que el Apelante alegó tener una cena de aniversario y solicitó quedarse con el vehículo.[128] Sin embargo, el agente respondió que no era posible, por lo que lo citó para que compareciera al día siguiente con el propósito de la investigación del vehículo ocupado.[129]

---

[120] *Íd.*, pág. 96, líneas 5-11.
[121] *Íd.*, pág. 96, líneas 18-22.
[122] *Íd.*, pág. 97, líneas 1-8; 12-25.
[123] *Íd.*, pág. 97, líneas 28-30- pág. 98, líneas 1-6.
[124] *Íd.*, pág. 98, líneas 5-29.
[125] *Íd.*, pág. 100, líneas 18-28- pág. 101, líneas 1-12; 13-19.
[126] *Íd.*, pág. 101, líneas 1-12.
[127] *Íd.*
[128] *Íd.*, pág. 101, líneas 22-24.
[129] *Íd.*, pág. 101, líneas 20-30- pág. 102, líneas 1-5.

Expresó el agente Rodríguez Colón que, al día siguiente, el Apelante no se presentó, sino que llamó para excusarse, e indicó que no podía llegar por estar "a pie".[130] A esos fines, solicitó ser entrevistado el 24 de febrero de 2023.[131] Por ello, el agente Rodríguez Colón, explicó que lo citó nuevamente, pero tampoco compareció ni llamó.[132] Relató que, pese a fijar una nueva cita, el Apelante no compareció ni justificó su ausencia, por lo que, tras consultar con el Departamento de Justicia, se decidió radicar el caso en ausencia.[133]

Testificó que en su investigación, la representante del área de contabilidad de Adriel Toyota, la señora Colón, le confirmó que nunca se recibió el pago por el vehículo.[134] Asimismo, mencionó que, al entrevistar a la compañía Rivera Gas en Levittown, Toa Baja, descubrió que el nombre que aparecía en el *cheque entregado* no correspondía a dicha empresa.[135] Identificó en sala un documento del Departamento de Estado que indicaba que Rivera Gas fue creada el **9 de diciembre de 2016 y cancelada el 30 de diciembre de 2023 por incumplimiento en la presentación de informes y el pago de derechos anuales desde 2018 hasta 2022.**[136] Asimismo, el agente Rodríguez Colón identificó un certificado de cambio de agente residente que reflejaba que el señor Edward Vargas había sido sustituido por el señor Christopher Narváez el 6 de marzo de 2018.[137] Posteriormente, identificó un certificado de incorporación emitido por el Secretario de Estado, el cual certifica que la corporación Rivera Gas Services fue cancelada el 30 de diciembre de 2023, debido al incumplimiento en la presentación de informes y en

---

[130] *Íd.*, pág. 102, líneas 10-14.
[131] *Íd.*, pág. 102, líneas 6-22.
[132] *Íd.*
[133] *Íd.*, pág. 102, líneas 22-28.
[134] *Íd.*, pág. 104, líneas 20-29- pág. 105, líneas 1-3.
[135] *Íd.*, pág. 106, línea 7.
[136] *Íd.*, pág. 106, líneas 13-25.
[137] *Íd.*, pág. 106, líneas 29-30- pág. 107, líneas 1-5.

el pago de derecho anuales correspondientes a los años 2018, 2019, 2020, 2021 y 2022.[138]

En el contrainterrogatorio, informó que en su investigación determinó que el señor Amaro "autoriz[ó] el posible cheque de Rivera Gas, ya que Rivera Gas[,] es lo que me informa a mi Don Nicolas Amaro[,] le vendía *pickup* a esa, a esa compañía de gas en tie... en años atrás y el... por esa costumbre de venta pues pensaba que era, los mismos propietarios".[139] Reveló que, para la fecha de los hechos, el Apelante fungía como presidente de Rivera Gas y mantuvo ese cargo hasta diciembre de 2023.[140] Finalmente, destacó que, al recuperar el vehículo, notó que **tenía un kilometraje elevado para ser nuevo** y que una de las llantas presentaba daños por posible impacto con una acera.[141]

Así las cosas, **el 3 de abril de 2024**, le correspondió a Héctor García Hernández ("señor García Hernández"), ofrecer su testimonio en sala. Este testigo declaró que trabaja en *First Bank* desde hace ocho (8) años, y al momento de testificar se desempeñaba en el Departamento de Requerimientos Legales.[142] Declaró que, como parte de sus funciones, examina requerimientos de información de los estados de cheques, lo cual ha realizado en más de cien (100) ocasiones.[143] En lo pertinente a la presente controversia, señaló que se le proveyó un cheque con el fin verificar si pertenecía a una cuenta de *First Bank*, ya que se utilizó para la compra de un vehículo de motor.[144] Atestó que verificó en el sistema de información el número de cuenta que surgía del cheque, **y no encontró ninguna cuenta activa o cerrada en *First Bank*.** [145]

---

[138] *Íd.*, pág. 107, líneas 15-30- pág. 108 líneas 1-10.
[139] *Íd.*, pág. 113, líneas 17-30- pág. 114 líneas 1-3.
[140] *Íd.*, pág. 114, lianas 9-25.
[141] *Íd.*, pág. 116, líneas 4-14.
[142] *Íd.*, pág. 118, líneas 18-26.
[143] *Íd.*, pág. 120, líneas 19-26
[144] *Íd.*, pág. 121, líneas 19-25.
[145] *Íd.*, pág. 121, líneas 26-30.

Aclaró que la solicitud fue realizada por el agente investigador del caso mediante un *subpoena* que incluía copia del cheque.[146] Detalló que, el cheque carecía de señas de seguridad, como **el *Void* que normalmente aparece al sacarle una fotocopia para impedir que "vaya y cajeen ese cheque más adelante"**.[147] Del mismo modo, manifestó que al realizar la búsqueda bajo el nombre de Rivera Gas no obtuvo resultados, a lo que indicó que no se trataba de una cuenta personal, pues en las cuentas personales aparece el nombre de la persona.[148] Además, señaló que los números de cuenta en el cheque reflejaban que se trataba de una cuenta de cheque personal solamente y no una cuenta corporativa.[149] También, sostuvo que la letra utilizada para consignar la cuantía difería del resto del documento, lo que indicaba que posiblemente fue puesto en maquinilla, **por lo que no era un cheque prefabricado**.[150] Expresó que tras analizar la situación concluyó que se trataba de **un cheque falso**, puesto que el número de **cuenta no correspondía a una cuenta corporativa, no aparecía registrado en el sistema y tampoco figuraba el nombre del Apelante, quién había firmado el cheque**.[151]

Explicó que se trataba de una copia de un depósito que se realizó en Oriental Bank, y reflejó un *Return Recent-E unable to locate account* ya que no existe una cuenta con ese número.[152] En el contrainterrogatorio, el señor García Hernández declaró que en algunos casos, los cheques no los hace el banco, pero pueden ser válidos siempre que contengan la información adecuada y corresponda a una cuenta del banco.[153] Adujo que se percató que el

---

[146] *Íd.*, pág. 122, líneas 1-7.
[147] *Íd.*, pág. 122, líneas 23-28.
[148] *Íd.*, pág. 123, líneas 16-23.
[149] *Íd.*, pág. 123, líneas 25-30- pág. 124 líneas1-2.
[150] *Íd.*, pág. 124, líneas 5-16.
[151] *Íd.*, pág. 124, líneas 20-30.
[152] *Íd.*, pág. 124 líneas 27-30- pág.125 líneas 1-12.
[153] *Íd.*, pág. 127 líneas 21-30-pág.128- líneas.1-3.

cheque tenía fecha del 23 de enero de 20**22**, por lo cual, ya había caducado y no se podía cambiar.[154]

En el redirecto, aclaró que para que un cheque pueda considerarse válido, debe contener el nombre **de la corporación, el número de cuenta correcto y si es un cheque corporativo, el número debe coincidir con ese tipo de cuenta**.[155]

Adujo que, en este caso, la invalidez del cheque **no respondía a la fecha consignada, sino al hecho de que la cuenta no existe**, por lo que la fecha resultaba irrelevante.[156] Asimismo, aseguró que en *First Bank* **no se hacen cheques a maquinilla**, sino que se utiliza el *laser printer* y se imprime completo, pero el cheque en controversia, surgía que había diferencia en la letra entre la cantidad escrita y la cantidad en número.[157] Por último, expresó que no existe probabilidad de que un cheque con información incorrecta sobre la cuenta, sucursal y dirección pudiera ser redepositado.[158] En el recontrainterrogatorio, testificó que un cheque caducado no puede ser cambiado, pero puede ser depositado y manifestó que, aunque puede ser depositado, "no lo pagan".[159]

Tras este testimonio, **el 8 de abril de 2024**, el Apelante hizo una petición para presentar prueba exculpatoria y tras habérsele interrogado y contrainterrogado, el foro primario declaró la misma *No Ha Lugar*.[160] Así las cosas, **el 9 de abril de 2024**, la defensa comenzó con su desfile de prueba y sentó a testificar al Apelante, el señor Narváez Rivera. Este declaró que tenía treinta y ocho (38) años, trabajaba realizando instalaciones de gas propano y era chofer de *Uber*.[161] Declaró que, el **20 de enero de 2023**, tenía intenciones

---

[154] *Íd.*, pág. 132, líneas 3-14.
[155] *Íd.*, pág. 133, líneas 1-10.
[156] *Íd.*, pág. 133, líneas 15-20.
[157] *Íd.*, pág. 135, líneas 10-15.
[158] *Íd.*, pág. 135, líneas 19-24.
[159] *Íd.*, pág. 136 líneas 15-28- pág. 138, líneas 1-12.
[160] *Íd.*, pág. 139-161.
[161] *Íd.*, pág. 164, líneas 12-22.

de adquirir un vehículo de motor para su uso personal, para la compañía Rivera Gas, y de igual forma para usarlo como chofer de *Uber*.[162] Atestó que decidió financiar el vehículo a nombre de la compañía, con él cómo codeudor.[163] Explicó que, para el 20 de enero de 2023, él era el dueño de Rivera Gas.[164] Igualmente agregó que fungió como presidente de la  aludida compañía hasta diciembre de 2023.[165]

Esbozó que se comunicó mediante *Facebook Messenger* con el señor Morales Orama, quien le manifestó que trabajaba en Adriel Toyota, y, acto seguido, le compartió su número telefónico, y lo llamó.[166] Testificó además que  sus conversaciones  con el señor Morales Orama datan de al menos un mes antes del 20 de enero de 2023.[167] Relató que conversó con el señor Morales Orama, sobre la idea de comprar un vehículo *pickup* para trabajar como *Uber*, pero en su lugar, el propio señor Morales Orama le sugirió que optara por un vehículo híbrido.[168]

El Apelante narró que el, **20 de enero de 2023**, el señor Morales Orama le compartió fotos de un vehículo edición limitada, a lo cual el Apelante ripostó que tenía interés en adquirir el mismo.[169] De igual forma, el Apelante alegó que no se personó al concesionario pues acostumbraba comprar vehículos de motor por teléfono.[170] Igualmente, narró que el señor Morales Orama le notificó que la compra debía ser lo más rápido posible y, en ese sentido, el Apelante le informó que quería hacer la transacción a nombre de la corporación, figurando él como codeudor.[171] Expuso que le solicitó tiempo al señor Morales Orama para confeccionar los estados

---

[162] *Íd.*, pág. 165, líneas 1-15.
[163] *Íd.*, pág. 165, líneas 16-22.
[164] *Íd.*, pág. 165, líneas 23-30- pág.166 líneas 1-2.
[165] *Íd.,* pág. 166, líneas 22-26.
[166] *Íd.*, pág. 167, líneas 1-27.
[167] *Íd.*, pág. 167, líneas 21-28- pág. 168 líneas 1-8.
[168] *Íd.*, pág. 168, líneas 8-18.
[169] *Íd.*, pág. 168, líneas 20-25.
[170] *Íd.*, pág. 168, línea 30- pág.169, líneas 1-4.
[171] *Íd.*, pág. 169, líneas 6-12.

financieros y de ahí, el señor Morales Orama le explicó el concepto de *supporting*.[172] En tal sentido, explicó que una de las maneras de hacer un *supporting* era mediante un cheque el cual se retenía, no se depositaba y cuando el financiamiento se aprobara, se rompía el cheque y el préstamo pagaba el carro.[173]

De otro lado, el Apelante declaró lo siguiente:

> [E]l cheque yo se lo hago, yo se lo hice, **el cheque yo lo prepar[é] yo mismito** porque la corporación mía yo todos los cheques de la corporación siempre pa' [sic] pagar lo que fuera, **yo siempre los pagaba yo, o sea, los cheque si se me...se generaban un programa que era como Quickbooks que es un programa de contabilidad y generaba los cheques**, tu podías pagar los cheques de pagadero "Ininteligible" de lo que fuera. Hubo un tiempo que yo generaba los cheques, pues yo le dije yo "**yo voy hacer un cheque, pero este cheque no lo puedes depositar**", yo siempre le fui claro que no lo puede depositar, eso esta tan claro que yo para, para evitar el dep[ó]sito hice 2 cosas lo puse con una fecha posdatada y también le puse una fecha anterior un año eso, eso Bryan lo sabía y yo también y la intención de esto era por si acaso lo quisieran depositar no iban a poder [...] (Énfasis nuestro).[174]

El Apelante adujo que fue el señor Morales Orama el que le sugirió hacer la transacción de esa manera, y que la razón de colocar una fecha anterior en el cheque fue para evitar que lo depositaran, pues había tenido experiencias previas referente a cheques sin fondos.[175]

Relató que coordinó encontrarse con el señor Morales Orama cerca de la Funeraria Asencio en Bayamón, lugar donde le entregó el cheque.[176] De igual forma, el Apelante narró que conocía personalmente al dueño de Adriel Toyota, el señor Amaro.[177] Expuso que, por tal motivo, decidió llamarlo directamente pues explicó que "Adriel Auto no acepta cheques personales, ellos no lo aceptan nunca." Pero pensó que por la relación que tenía con éste, lo aceptaría.[178] Por otro lado, narró que cuando se comunicó con el

---

[172] *Íd.*, pág. 171, líneas 6-15.
[173] *Íd.*, pág. 171, líneas, 17-28.
[174] *Íd.*, pág. 172, líneas 8-26.
[175] *Íd.*, pág. 173, líneas 7-22.
[176] *Íd.*, pág. 176 líneas 24-30-177, líneas 1-11.
[177] *Íd.*, pág. 178, líneas 21-24.
[178] *Íd.*, pág. 178 líneas 27-30- pág.179, líneas 1-2.

señor Amaro, él, el Apelante, se identificó como dueño de Rivera Gas, y le comunicó al dueño del concesionario que había adquirido vehículos anteriormente con ellos, a lo que el señor Amaro respondió que lo recordaba y que llamaría al gerente para "autorizar la, la compra con, con el cheque [...] para que pudiera pagar el vehículo".[179]

De igual forma, declaró que el *cheque entregado* contenía información de la corporación Rivera Gas, con fecha del año 2022.[180] El Apelante declaró que previamente había tenido un caso por fraude y apropiación ilegal.[181] Cónsono con lo anterior, añadió que, entendía que el señor Morales Orama no le dio la oportunidad de cumplir con acordado, al éste último advenir en conocimiento de sus antecedentes.[182]

Expresó que el señor Morales Orama le indicó que, tras recibir el *cheque entregado* devuelto, el gerente del concesionario le exigió un cheque de gerente como condición para continuar con la transacción, de lo contrario, esta se cancelaría.[183] Adujo que, no tenía el dinero completo en efectivo, y por ello intentaba ganar tiempo para presentarse en el concesionario.[184]

El Apelante declaró que entendía que el concesionario quería una garantía, por lo que le ofreció al señor Morales Orama los datos de dos (2) personas para incluirlas como *supporting*, pero cuando llamó al señor Morales Orama, éste le dijo que las mencionadas personas no cualificaban.[185] Subsiguientemente, explicó que llamó al señor Amaro y que éste le comunicó que no quería continuar con la transacción y que debía devolver el vehículo.[186] De otro lado, el

---

[179] *Íd.*, pág. 180, líneas 1-28.
[180] *Íd.*, pág. 181, líneas 1-28.
[181] *Íd.*, pág. 182, líneas 12-18.
[182] *Íd.*, pág. 183, líneas 1-22.
[183] *Íd.*, pág. 185, líneas 11-14
[184] *Íd.*, pág. 185, líneas 19-24.
[185] *Íd.*, pág. 188, líneas 1-23.
[186] *Íd.*, pág. 189, líneas 17-28.

Apelante testificó que, cuando el agente se llevó el vehículo, lo citó al cuartel al día siguiente, pero dado a que el vehículo de motor había sido recuperado, éste entendió que no tenía que acudir ante la policía.[187]

En el contrainterrogatorio, en lo pertinente, afirmó que la compañía Rivera Gas no rindió planillas en los años 2018, 2019, 2020, 2021 y 2022.[188] En cuanto al asunto referente sobre si falsificó una firma para comprar un vehículo de motor marca Jeep, el Apelante indicó que eso fue un caso anterior.[189] Al preguntársele si incurrió en falsificación de una firma para comprar un vehículo mediante un cheque falso y si se apropió ilegalmente de la identidad de una persona, admitió que había cumplido una sentencia por ello.[190]

Con este testimonio, la defensa dio por sometido su caso. Por otra parte, además de la prueba testifical previamente reseñada, el foro primario admitió la siguiente prueba documental en el juicio:

Exhibit 1: pendrive (audios del chat)
Exhibi1t 2: Relación del Chat impreso
Exhibit 3: Factura de Adriel Toyota
Exhibit 4: Licencia
Exhibit 5: Consentimiento de Registro de Bryan Morales
Exhibit 6: Hoja de depósito del Banco Oriental
Exhibit 7: Cheque devuelto
Exhibit 8: Aviso devolución de cargos
Exhibit 9: Reconciliación Banco Oriental
Exhibit 10: Fotos del vehículo.
Exhibit 11: Inventario del vehículo
Exhibit 12: PPR-621.1
Exhibit 13: Certificación del Banco *First Bank*
Exhibit 14: Sentencia

Con este recuento presente, procedemos a resolver. Nos corresponde evaluar si el foro primario incidió al emitir el veredicto

---

[187] *Íd.*, pág. 190, líneas 20-30.
[188] *Íd.*, pág. 194, líneas 1-9.
[189] *Íd.*, pág. 199, líneas 3-9.
[190] *Íd.*, pág. 199, líneas 19-29.

de culpabilidad por los delitos imputados contra el Apelante más allá de duda razonable. Aclaramos que el concepto *más allá de duda razonable* se refiere a aquella insatisfacción o intranquilidad en la conciencia del juzgador sobre la culpabilidad del acusado una vez desfilada la prueba. *Pueblo v. García Colon I, supra.*

La prueba presentada y admitida demostró que **el 20 de enero de 2023**, el Apelante se comunicó con el señor Morales Orama con el propósito de adquirir un vehículo de motor. Para ello, el Apelante utilizó un cheque en el cual, en la parte superior central del mismo, estaba escrito: "FIRST BANK ISLA VERDE". De igual manera, el c*heque entregado* por el Apelante ilustraba la cuantía de $36,995.00, el número de cuenta 110005461, la fecha del 23 de enero de 2022, y  el nombre "RIVERA GAS" en la parte superior izquierda. A cambio de este cheque, el Apelante recibió un vehículo de motor marca Toyota modelo Corolla. La prueba presentada y admitida demostró que el aludido cheque utilizado en la transacción **no correspondía a ninguna cuenta del banco *First Bank*.** Ello quedó corroborado con el testimonio de la señora Colón, representante del área de contabilidad de Adriel Toyota, quien tramitó el cheque, y por el testimonio del señor García Hernández, empleado de *First Bank* quien, de igual forma, brindó información referente al aludido cheque. Resultó particularmente ilustrador el testimonio de este último testigo en lo referente a que el cheque en controversia **carecía de señas de seguridad**, contenía **tipos de letra diferente** y la numeración de la cuenta no correspondía a una cuenta corporativa, pese a que el cheque pertenecía a una compañía.

Asimismo, la incongruencia en el número de cuenta del aludido cheque quedó igualmente demostrada, mediante el *Exhibit* 13, la certificación de *First Bank* emitida el 27 de febrero de 2023. La referida certificación dispuso que el número de cuenta

110005461 **no estaba vinculado a ninguna cuenta de la institución.**

La prueba también demostró que el mencionado *cheque entregado* por el Apelante no contenía una fecha válida, pues la fecha que reflejaba era el **23 de enero de 2022**, pese a que la transacción se llevó a cabo el **20 de enero de 2023**. En otras palabras, el cheque no solo no coincidía con una cuenta del banco *First Bank* sino que el mismo tampoco contenía una fecha que correspondiera a la transacción. Por ello, el cheque entregado por el Apelante era un documento inválido para llevar a cabo cualquier tipo de transacción, pues el mismo **contenía información falsa y por tanto, este no podía ser usado para comprar el vehículo marca Toyota, modelo Corolla perteneciente a Adriel Toyota.**

Cónsono con lo anterior, la prueba demostró que el Apelante tenía conocimiento de estos elementos que invalidaban el cheque que se usó en la transacción. El Apelante admitió **que fue él quien elaboró el cheque mediante una aplicación**. El propio testimonio del Apelante ilustró que éste **estaba consciente de la fecha del documento** y que el mismo carecía de los fondos necesarios para poder llevar a cabo la transacción. De igual modo, la prueba demostró que el Apelante fue apercibido por el señor Morales Orama desde el **1 de febrero de 2023**, de que el *cheque entregado* al concesionario **no correspondía a ninguna cuenta bancaria**. No obstante lo anterior, el Apelante nunca compareció ante el concesionario con un nuevo cheque u otro método de pago validó, ni devolvió el vehículo de motor, sino todo lo contrario, mantuvo la posesión del vehículo, **sin haber pagado para ello,** hasta que el automóvil fue ocupado por la policía, el 20 de febrero de 2023.

Como corolario de lo anterior, el Apelante **admitió que estuvo** "comprando tiempo" para conseguir otros métodos de financiamiento para quedarse con el vehículo, pero no presentó

ninguna alternativa viable ni devolvió el automóvil. De esta forma, somos del criterio que la prueba presentada demostró más allá de duda razonable que el Apelante **poseyó un documento con información falsa**, el cual en este caso era un cheque. El Apelante **intentó pasar como genuino o verdadero** dicho cheque, pese a que el número de cuenta que se ilustraba en el **mismo no correspondía a ninguna cuenta bancaria**. Esta acción llevada a cabo por el Apelante se hizo con **el propósito de defraudar** a Adriel Toyota, pues el señor Narváez Rivera intentó adquirir un vehículo de motor propiedad de dicho concesionario utilizando como método de pago **el cheque con información falsa**, el cual fue elaborado **por el propio Apelante** y el cual colegimos, a base de la prueba ante nuestra consideración, que éste último tenía **conocimiento de que el mismo era falso**. Cónsono con lo anterior, concluimos que se configuró el delito contenido en el Artículo 217 del Código Penal, *supra,* y el mismo se demostró más allá de duda razonable.

De la misma forma, quedó evidenciado que el Apelante se apropió sin intimidación ni violencia, sino mediante engaño, de un vehículo de motor, el cual retuvo en su posesión por varias semanas. Ello, pese a ser apercibido de que la transacción para adquirir el aludido vehículo no se llevó a cabo por incongruencias en la información del cheque. Además, ante esta situación, el Apelante no suministró otro método de pago válido, ni devolvió el vehículo a su dueño. Nótese, que con estos hechos probados más allá de duda razonable, quedó demostrado la comisión del delito contenido en el Artículo 18.2 de la Ley Núm. 8 de 5 de agosto de 1987, *supra,* pues, mediante la utilización de un cheque con información falsa el cual hacía invalido el mismo, el Apelante se apropió ilegalmente de un vehículo de motor propiedad de Adriel Toyota.

A tenor con lo antes esbozado, determinamos que el foro *a quo* no cometió el error imputado, por lo que corresponde confirmar el dictamen apelado.

**IV.**

Por los fundamentos expuestos, **confirmamos** la *Sentencia* Apelada.

Lo acordó y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones